## ATCHISON, T. & S. F. RY. CO. v. MERCHANTS' LIVE STOCK CO.

(Circuit Court of Appeals, Eighth Circuit. May 7, 1921.)

No 5654.

**1. Carriers ⚖⇒211—Duty of caretakers to care for stock at feed stations.**

Under the provision of Twenty-Eight Hour Law, § 2 (Comp. St. § 8652), that "animals so unloaded shall be properly fed and watered during such rest either by the owner or person having the custody thereof, or in case of his default in so doing then by the railroad * * *· at the reasonable expense of the owner or person in custody thereof," where the carrier furnishes free transportation to caretakers for a shipment of stock, as permitted by law, it is primarily their duty as matter of law to unload, care for, and reload the stock at rest stations, and the refusal of the caretakers to perform such duty or to assist therein is matter of defense in an action against the carrier for loss of stock alleged to have been due to the improper and unskillful manner in which the stock was handled and reloaded by its employés, especially where the bills of lading expressly provided that it should not be liable for any loss, damage, or delay due to the act or default of the shipper or his agents

**2. Carriers ⚖⇒228(3)—Evidence held incompetent in action for loss of stock.**

On an issue as to liability of a railroad company for loss and damage to stock in shipment, alleged to have been due to improper handling and delay in the transportation, evidence that another shipment a month later went through in two days' less time and with much smaller loss, without showing the comparative condition of the cattle, the conditions under which the shipments were made, or whether the time made was usual or unusual, *held* incompetent, as introducing collateral and irrelevant issues.

In Error to the District Court of the United States for the District of New Mexico; Colin Neblett, Judge.

⚖⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Action at law by the Merchants' Live Stock Company against the Atchison, Topeka & Santa Fé Railway Company. Judgment for plaintiff, and defendant brings error. Reversed.

Gardiner Lathrop, of Chicago, Ill. (W. C. Reid, C. M. Botts, and G. S. Downer, all of Albuquerque, N. M., on the brief), for plaintiff in error.

L. O. Fullen and W. A. Dunn, both of Roswell, N. M., for defendant in error.

Before HOOK and CARLAND, Circuit Judges, and LEWIS, District Judge.

LEWIS, District Judge. The Merchants' Live Stock Co. recovered a judgment against the Railway Co. as its damages to a shipment of 41 carloads of cows and calves from Avalon, N. Mex., to Kansas City, Mo. The cattle were driven in from the range 60 miles out in five days, held for a day in a pasture nearby, loaded into cars during the forenoon of October 25, 1917, left Avalon that afternoon and reached Kansas City on the morning of October 30th. Five calves and 66 cows in a total of 1,678 died in transit, or were left on the way as too weak to be reloaded,—some at Amarillo, the first unloading place, but the most of them, more than 50 head, at Strong City, where they were again unloaded for feed, water and rest. Two dead cows were left at Wellington and two or three were dead in the cars at Kansas City. The complaint charged that the loss was occasioned by slow speed of the train, long and needless stops, inadequate pens and facilities for feeding and watering at Amarillo and Strong City, failure to supply them with water, negligently loading after unloading, so that some cars were overloaded and calves unnecessarily separated from their mothers, jerking, jarring and roughly handling the train, all of which caused the cattle to be greatly weakened, trampled in the pens and in the cars, and those that were not killed, crippled or abandoned on the way reached destination in an injured condition and shrunken in weight, thus decreasing their market value, and that if they had been transported with reasonable diligence they would have been sold on a higher market than the one which obtained when destination was reached. The Railway Company denied these charges in its answer, and put in proof to show that the damages claimed were caused largely by the poor and weakened condition of the cows when they were loaded for shipment, by failure of the caretakers who accompanied the shipments to assist in unloading and reloading the cattle and feeding and watering them at Amarillo and Strong City, and also that a cold north wind accompanied with snow set in before Strong City was reached, which, together with the poor and weak condition of the cows caused the large loss of them there. The season had been unusually dry, the range was not good, the cows were old and thin in flesh and were being shipped out for the purpose, in part, of leaving grass so that the remainder and better part of the herd could winter through. There were four caretakers with the shipment, including the general manager of the Live Stock Company, who had all been given transportation to accom-

pany the shipment as caretakers. That practice is of long standing, Ry. Co. v. Chatham, 244 U. S. 276, 37 Sup. Ct. 499, 61 L. Ed. 1131, L. R. A. 1917F, 1128, and has had express legislative recognition. The Act to regulate commerce (34 Stat. 584, § 1 [Comp. St. § 8563(5)], permits free transportation "to necessary caretakers of live stock"; and one of the alleged errors assigned and relied on is the claim that the court incorrectly instructed the jury as to the duty of these caretakers in assisting to unload, reload, feed and water the cattle at Amarillo and Strong City. The bills of lading referred to the caretakers as "attendants in charge of this shipment," and expressly provided that "the carrier shall not be liable for any loss, damage or delay due to * * * the act or default of the shipper or his agents," and the tariffs of the carrier filed with the Interstate Commerce Commission repeat the substance of Sec. 2 of the 28-Hour Law, 34 Stat. 608 (Comp. St. 8652). That law provides that animals unloaded for rest, feed and water "shall be properly fed and watered during such rest, either by the owner or person having the custody thereof, or in case of his default in so doing," then by the railroad company, and if that service is performed by the railroad company it shall "have a lien upon such animals for food, care, and custody furnished."

[1] On the foregoing, the contention is made by plaintiff in error that the shipper, through its caretakers, was under the legal duty to assist in unloading, reloading, feeding and watering the cattle at Amarillo and Strong City,—indeed, that these were primarily duties of the caretakers,—and that the court should have expressly so instructed the jury, and that the caretakers could not be permitted to judge for themselves whether they would or would not lend assistance under the surrounding circumstances, and that plaintiff's damage should be diminished to the extent that the assistance of the caretakers would have lessened the loss. The general manager forbade the caretakers to give any assistance at Strong City, and there is testimony that they gave none at Amarillo, although a part of the damage claimed was dependent on the manner in which the cattle were unloaded, reloaded, and fed and watered at those points. The court, in the forepart of an instruction (No. 24) declared the law, as now and then contended for by plaintiff in error, that is, that it was the duty of the caretakers to assist in unloading, feeding, watering, resting and reloading the cattle, and that if the caretakers, by using their reasonable diligence and the means at their command could have prevented or diminished the damage done, then any such damage which might have been so prevented, or the amount in which such damage might have been diminished, the defendant was not responsible for. But the court added to this declaration of law the following:

"And it is for you to say from all the evidence in this case bearing upon that point, whether or not, under all the circumstances as they existed at the time, the use of reasonable diligence on the part of the caretakers and the means at their command *required* them to assist in the unloading, feeding, watering, resting and reloading the cattle at Strong City."

The jury was instructed before argument, and the excerpt was added by the court after the case had been partly argued. The defendant

saved its exception to the instruction as thus changed. We are of opinion that the instruction was right without the addendum,—it declared the duty as a matter of law; and that with it, it was wrong and prejudicial for two reasons: 1st, it left the matter of duty a question of fact to be settled by the jury, and 2d, the instruction thus became self-contradictory. There was no issue on the facts as to the question of duty. The train arrived at Strong City 1:30 a. m., October 29th. The crew were properly notified that the cattle must be unloaded there to keep within the 28-Hour Law (Comp. St. §§ 8651–8654) under which an extension to 36 hours had been made. They had been confined in the cars 34 hours since being loaded at Amarillo. The general manager of the Live Stock company insisted that they proceed to a station beyond, where pens and facilities for feeding and watering were larger and better, as he claimed; and because his request was not acceded to he refused to let the caretakers render any assistance in unloading, feeding and watering. The Railway Company was not able, with the available help, part of the train crew and section men, to get all of the cattle out of the cars until about nine o'clock. The caretakers stood by and looked on as they were directed to do by the general manager. One of them testified:

"Q. How were the cattle unloaded by the people who unloaded them, just describe as nearly as you can how the cattle were handled in the cars and how in the yards by the men. A. They didn't seem to know anything about stock. * * *

"XQ. You knew that the stock was suffering greatly by reason of not being unloaded more rapidly? A. Yes, sir.

"XQ. You knew the stock was suffering greatly by reason of the inexperience of these men in unloading the cattle? A. Probably so."

They gave no assistance whatever in unloading, but one of them testified that when it came to reloading, the railroad men were so inapt, did the work so poorly, and treated the cattle so badly that he finally went in and helped out. One element of damages insisted upon by the plaintiff was that feed for the cattle was put on the ground, and so many were crowded in a pen that they trampled it and did not eat it. Another ground was that some of them were not watered. One pen at Amarillo, and perhaps one at Strong City, had no watering trough. Some of them had racks for hay. One of the caretakers testified as to those subjects in reference to the stop at Amarillo:

"XQ. Why didn't you and the other parties put it (hay) in the racks? A. Because we had nothing to do with the feeding. * * *

"XQ. Why didn't you put the feed in the racks? A. I wasn't supposed to. * * *

"XQ. You could have put the cattle in other pens and watered them? A. I had nothing to do with it."

Counsel for defendant in error took the position in argument that the only duty of a caretaker is to get cattle up on their feet when they are down in the cars. We are not advised as to just why he makes that limitation, nor are we persuaded that the contention is sound. In view of the long practice, the statutory provisions and the terms of the bills of lading, we think there was a clear legal duty and obligation on the shipper to render such aid and assistance through the caretakers

from time to time en route as would be helpful in protecting the shipment against loss and damage. Such an arrangement between shipper and carrier was not then prohibited. The rigor of the common-law rule against the carrier, which had not been changed in that respect, "might be modified through any fair, reasonable and just agreement with the shipper which did not include exemption against the negligence of the carrier or his servants." Adams Express Co. v. Croninger, 226 U. S. 491, 509, 33 Sup. Ct. 148, 57 L. Ed. 314, 44 L. R. A. (N. S.) 257. Loss or damage attributable to the shipper is not caused by the carrier's negligence. Starr v. R. R. Co., 103 Neb. 645, 173 N. W. 682; Fluckiger v. Ry. Co., 99 Neb. 6, 154 N. W. 865; Grieve v. R. R. Co., 104 Iowa, 659, 74 N. W. 192; Cleve v. Ry. Co., 77 Neb. 166, 108 N. W. 982, 124 Am. St. Rep. 837, 15 Ann. Cas. 33; Weaver v. Ry. Co., 9 Ga. App. 34, 70 S. E. 222; Railway Co. v. Schuldt, 66 Neb. 43, 92 N. W. 162; Webster v. R. R. Co. (D. C.) 200 Fed. 597; Lumber Co. v. Ry. Co., 34 Interst. Com. Com'n R. 1; Beef & Provision Co. v. R. R. Co., 46 Interst. Com. Com'n R. 401; Stock Exchange v. Ry. Co., 52 Interst. Com. Com'n R. 209, 223.

[2] Over the defendant's objection the court permitted the plaintiff below to prove that one month after the shipment in question it shipped over the same line 800 head of cattle of like kind, which it gathered from the same range, from Avalon to Kansas City, and that while the first shipment required five days in transit the last went through in three days, that of the last shipment only one calf and two cows were lost, and that the shrinkage in weight was two or three times more per head in the first shipment than in the last one. The effect of this was to bring into the case many collateral issues, to present issues of fact which the Railway Company was not prepared to meet, and to lead the jury aside on an inquiry of facts which would not furnish it a safe guide in reaching a correct and just conclusion on the questions which it was called to hear and determine. What were the comparative ages and physical strength of the cattle in the two shipments? What were the comparative conditions as to flesh? When and to what extent had the cattle in each shipment been fed and watered prior to being put on the cars? Was three days the average run from Avalon to Kansas City or was it exceptionally short? The first would be a fair guide, the latter misleading. How much time was consumed in driving the last shipment in from the range and what were the conditions as to feed and water on the way, as compared to the first shipment? What was the difference in weather conditions, and its effect? Even if these inquiries had not been collateral and therefore irrelevant, the defendant could not have been expected to be prepared to meet them. We think the challenged proof was irrelevant, misleading and prejudicial.

Other assigned errors have been considered, but they are deemed to be without merit.

Reversed.